Appeal No. 22-11556

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Isaac Payne,

PLAINTIFF-APPELLANT,

v.

The Savannah College of Art and Design, Inc.,

DEFENDANT-APPELLEE

On appeal from the United States District Court

for the Northern District of Georgia, Atlanta Division

Case No. 1:20-cv-05000-JBP

BRIEF OF APPELLANT

Daniel Werner
Georgia Bar No. 422070
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave., Suite 1080
Decatur, Georgia 30030
(678) 271-0300 Telephone
(678) 271-0314 Facsimile
dan@decaturlegal.com

Counsel for Plaintiff-Appellant

*Isaac Payne v. The Savannah College of Art and Design, Inc.*
*Appeal No. 22-11556-EE*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned attorney certifies, pursuant to Eleventh Circuit Rule 26.1-1, that the following may have an interest in the outcome of this case:

Boulee, Honorable Jean-Paul

English, Joseph M.

Fuller, Honorable J. Clay

Mullally, Kelly Casey

Payne, Isaac

Radford, James

Radford & Keebaugh, LLC

Ross, Michael Eric

Salinas, Honorable Catherine M.

Sears, Lisa Ward

Smith, Gambrell & Russell, LLP

Taylor English Duma LLP

The Savannah College of Art and Design, Inc.

Werner, Daniel

*Isaac Payne v. The Savannah College of Art and Design, Inc.,
Appeal No. 22-11556*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes oral argument will significantly aide the Court in resolving the issues raised in this appeal. He therefore respectfully requests oral argument.

# TABLE OF CONTENTS

Table of Authorities ................................................................ *vi*

Statement of Subject Matter and Appellate Jurisdiction ..................... 1

Statement of the Issues ........................................................... 2

Statement of the Case ............................................................. 2

    I.    The Course of Proceedings and Dispositions in the
        Court Below ................................................................. 2

    II.    Statement of the Facts ............................................... 6

        A.    Mr. Payne's Underlying Discrimination Claim ......... 6

        B.    Arbitrability ................................................. 9

    III.    Standard of Review ............................................... 24

Summary of the Argument ...................................................... 25

Argument and Citations of Authority ......................................... 27

    I.    The District Court Erred in Determining That
        the Arbitration Agreement Is Not Unconscionable ............ 27

        A.    Standard for Unconscionability ................................. 27

        B.    The Excessive Cost-Shifting Provisions Prohibit
            Mr. Payne from Vindicating His Rights ..................... 30

        C.    The Selection-Of-Arbitrator Provision Is
            Unconscionable ........................................... 46

        D.    The ADRPA and APM are Procedurally
            Unconscionable ........................................... 53

II.     The Court Should Decline to Enforce the Agreement,
        Rather Than Severing Unconscionable Terms ................... 60

III.    The District Court Erred in Not Concluding That
        SCAD Waived Its Right to Arbitrate ................................. 63

IV.     The District Court Erred in Not Permitting Mr. Payne
        To Take Discovery on Issues of Arbitrability ..................... 67

Conclusion ................................................................................... 68

Certificate of Compliance .......................................................... 70

Certificate of Service ................................................................. 70

# TABLE OF AUTHORITIES

## CASES

*Aukerman v. Witmer*, 256 Ga. App. 211 (2002) ...................................... 54

*B.L. Harbert Int'l, LLC v. Hercules Steel Co.,* 441 F.3d 905
   (11th Cir. 2006) ................................................................................ 45

*Ball v. SFX Broad., Inc.*, 165 F. Supp. 2d 230 (N.D.N.Y. 2001) ............ 34

*Batson v. Kentucky*, 476 U.S. 79 (1986) ................................................. 52

*Bazemore v. Jefferson Cap. Sys.*, LLC, 827 F.3d 1325
   (11th Cir. 2016) ....................................................................... 24, 41, 67

*Bess v. Check Express*, 294 F.3d 1298 (11th Cir. 2002) ................... 28, 49

*Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002) ................. 36

*Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338 (11th Cir. 2017) ................... 25

*Burton-Dixie Corp. v. Timothy McCarthy Constr. Co.*, 436 F.2d 405
   (5th Cir. 1971) ................................................................................ 65

*Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359
   (11th Cir. 2005) ......................................................................... 55, 59

*Cannon v. S. Atlanta Collision Ctr.*, No. 1:11-CV-1030-TWT-ECS,
   2012 WL 1004914, at *5 (N.D. Ga. Feb. 27, 2012) ................. 30, 51, 61

*Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301 (N.D. Ga. 2012) ............... 57

*Crespo v. Kapnisis, No. 21-CV-6963 (BMC), 2022 WL 2916033*
   *(E.D.N.Y. July 25, 2022)* ............................................................. 34, 38

*Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205 (11th Cir. 2011) .......... 25

*Dale v. Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007)..........................29

*Dedmon v. OKC Southern Hills Investments, LLC*, Case No. CIV-21-00073-PRW, 2021 WL 5234556 (W.D. Ok. Nov. 9, 2021) ...................37

*Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996) ...................28

*Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002)...................55

*Epps v. Rockmo Entm't, LLC*, 849 S.E.2d 510, (Ga. Ct. App. 2020), reconsideration denied (Nov. 17, 2020) ................................................64

*First Acceptance Ins. Co. of Georgia, Inc. v. Hughes*, 305 Ga. 489, 826 S.E.2d 71 (2019) ................................................................................49

*Flanders v. State*, 279 Ga. 35 (2005).........................................................52

*Frazier v. CitiFinancial Corp.*, 604 F.3d 1313 (11th Cir.2010) ..............45

*Great Western Mortg. Corp v. Peacock*, 110 F.3d 222 (3rd Cir. 1997)....34

*Green Tree Fin. Corp. – Alabama v. Randolph*, 531 U.S. 79 (2000) ..............................................................................................31, 36

*Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230 (11th Cir. 2018) .....64

*Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008) ............32, 45

*Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999)....50, 53, 62

*Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc.*, 215 Ga. App. 194, 450 S.E.2d 427 (1994) ..................................................................60

*Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739 (2009) ........................54

*Langfitt v. Jackson*, 284 Ga. App. 628, 633, 644 S.E.2d 460 (2007).......64

*Larry's United Super, Inc. v. Werries*, 253 F.3d 1083 (8th Cir. 2001)....34

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
  939 F.3d 1145 (11th Cir. 2019)...............................................65

*Matthews v. Ultimate Sports Bar, LLC*, No. 1:13-CV-2353-TWT,
  2016 WL 4035655 (N.D. Ga. July 28, 2016) ..................................54, 61

*MCI Telecommunications Corp. v. Matrix Commc'ns Corp.*,
  135 F.3d 27, (1st Cir. 1998) ...................................................34

*Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022) ...............26, 49, 57, 64

*Mullis v. Speight Seed Farms, Inc.*, 234 Ga. App. 27 (1998) .................29

*Murray v. United Food & Commercial Workers Intern.*,
  289 F.3d 297 (4th Cir.2002)..............................................30, 51

*Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255
  (11th Cir. 2003) ...........................................................*passim*

*NEC Techs., Inc. v. Nelson*, 267 Ga. 390, 478 S.E.2d 769 (1996) .....28, 29

*Neibert v. Computer Scis. Corp.*, No. 1:12-CV-02277-SCJ, 2014 WL
  11462721 (N.D. Ga. Feb. 4, 2014), *aff'd*, 621 F. App'x 585
  (11th Cir. 2015) ...............................................................59

*Nino v. Jewelry Exchange*, 609 F.3d 191 (3rd Cir.2010).........................30

*Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280
  (11th Cir. 2001) ...............................................................62

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)...49

*Reed v. Eastside Med. Ctr.*, LLC, No. 1:19-CV-03967-SDG,
  2020 WL 5659436 (N.D. Ga. Sept. 23, 2020) ..................................65, 67

*Reiterman v. Abid*, 26 F.4th 1226 (11th Cir. 2022)..................................24

*Residential Constructors, LLC v. ACE Prop. & Cas. Ins. Co.*, No.
2:05-CV-01318-BESGWF, 2006 WL 1582122
(D. Nev. June 5, 2006) ........................................................... 66

*S. Commc'ns Servs., Inc. v. Thomas*, 720 F.3d 1352 (11th Cir. 2013) ..... 45

*WellStar Health Sys., Inc. v. Kemp*, 324 Ga. App. 629,
751 S.E.2d 445 (2013) ............................................................ 66

*Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814 (11th Cir. 2020) ...... 25

STATUTES

9 U.S.C. § 3 .............................................................................. 27

9 U.S.C. § 4 ..................................................................... 24, 25

9 U.S.C. § 10. ......................................................................... 45

Ga. Code Ann. § 11-2-302 ................................................ 60, 61

Ga. Code Ann. § 13-2-2 ........................................................ 49

OTHER AUTHORITIES

AAA Employment/Workplace Fee Schedule, *available at*
https://www.adr.org/sites/default/files/Employment_Fee_
Schedule1Nov19.pdf ............................................................ 35

JAMS Policy on Employment Arbitration Minimum Standards of
Procedural Fairness, *available at* https://www.jamsadr.com/
employment-minimum-standards/........................................ 35

Restatement (Second) of Contracts § 184................................ 61

<u>TREATISES</u>

Eisenberg, Theodore, et al., *Arbitration and Litigation of Employment Claims: An Empirical Comparison*, Dispute Resolution Journal 58(4) (2003) ........................................................... 43

Katherine V.W. Stone, et al., *The Arbitration Epidemic*, EPI Briefing Paper, Economic Policy Institute (Dec. 7, 2015), https://bit.ly/3GownB0 ................................................................................. 43

*The Truth About Forced Arbitration*, American Association for Justice (Sept. 2019), https://bit.ly/3oDtDK4 ........................................ 42

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal from a final dispositive order of the district court. Therefore, this Court possesses appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Appellant's Notice of Appeal was timely filed with the district court on April 13, 2022 [Doc. 52], within 30 days of the district court's dispositive order and judgment, dated March 30 and 31, 2022, respectively [Docs. 50 and 51]. Therefore, this is a timely appeal pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

STATEMENT OF THE ISSUES

1.  Whether the District Court erred in finding that the parties entered into an enforceable agreement to arbitrate;

2.  Whether Defendant/Appellee The Savannah College of Art and Design, Inc. ("SCAD") waived its right to arbitrate Plaintiff/Appellant Isaac Payne's ("Mr. Payne") claims;

3.  Whether the entire contract is unenforceable or if the unconscionable provisions should be severed; and

4.  Whether the District Court erred in rejecting Mr. Payne's request to engage in limited early discovery regarding arbitrability.

STATEMENT OF THE CASE

## I.  The Course of Proceedings and Dispositions in the Court Below

Plaintiff/Appellant Isaac Payne ("Mr. Payne") filed his initial complaint in this case on December 10, 2020. [Doc. 1], and he filed his First Amended Complaint ("FAC") on February 1, 2021. [Doc. 13]. In the FAC, Mr. Payne brought claims against SCAD, his former employer, under the Civil Rights Act of 1866, 42 U.S.C. § 1981, alleging that SCAD discriminated against him on the basis of his race and retaliated

against him for engaging in statutorily protected activities. (FAC at ¶¶ 118-131 [Doc. 13]). Mr. Payne also sought a declaratory judgment on arbitrability and demanded a trial by jury to determine whether an agreement to arbitrate was made. (*Id.* at ¶¶ 80-117, 132-138).

SCAD filed its first operative motion seeking to compel arbitration on February 26, 2021 ("Renewed MTCA").[1] [Doc. 20]. Mr. Payne filed his Opposition on March 26, 2021. [Doc. 26], and SCAD filed its Reply on April 23, 2021 [Doc. 28]. Mr. Payne filed his first Motion to Take Limited Early Discovery on Arbitrability on May 5, 2021. [Doc. 30]. SCAD filed its Opposition to the discovery motion on May 21, 2021 [Doc. 31], and Mr. Payne filed his Reply on June 1, 2021. [Doc. 32].

On June 28, 2021, the Magistrate Judge issued a Report and Recommendation denying without prejudice SCAD's Renewed MTCA. [Doc. 33]. The Magistrate Judge determined an agreement to arbitrate had been formed. However, because SCAD had not produced an

---

[1] This was styled as "Defendant's Renewed Motion to Dismiss and to Compel Arbitration." [Doc. 20]. SCAD had filed an initial Motion to Dismiss and to Compel Arbitration on January 11, 2021. [Doc. 5]. The Magistrate Judge issued a non-final order denying the initial motion as moot after Mr. Payne filed his FAC (Mr. Payne had not yet filed opposition papers), and the District Judge approved and adopted the Magistrate Judge's Order on February 23, 2021. [Docs. 14 & 19].

authenticated copy of its Arbitration Procedures, nor any later version of the ADRPA it contended governed the dispute, the Magistrate Judge determined that SCAD had not proven "all the terms of that agreement [to arbitrate]." (*Id*. at 15).  The Magistrate Judge therefore directed that SCAD, if it chose to refile its motion, submit authenticated copies of the pertinent documents. (*Id*.). The Magistrate also denied Mr. Payne's early discovery motion as moot "because the Court is not yet resolving issues from [SCAD's] motion which relate to the discovery request." (*Id*. at 16). No objections were filed. Therefore, the District Judge approved and adopted the Report and Recommendation on July 20, 2021. [Doc. 37].

SCAD submitted its Refiled Motion to Dismiss and to Compel Arbitration on July 6, 2021 ("Refiled MTCA"). [Doc. 31]. The Refiled MTCA incorporated by reference SCAD's briefing from its Renewed MTCA and a previously submitted declaration. (*Id*., incorporating Docs. 20, 20-1, 28, and 28-1).[2] Mr. Payne filed his Opposition brief ("Refiled

---

[2] In his opposition to the Refiled MTCA, Mr. Payne raised concerns about the morass SCAD had created by incorporating its prior filings by reference [Doc. 38 at 1-2]; a problem that is more pronounced now that this Court must review the anfractuous record from the court below.

4

MTCA Opp'n") on July 20, 2021 [Doc. 38], and SCAD filed its Reply on August 3, 2021. [Doc. 39]. Mr. Payne filed a Renewed Motion to Take Early Limited Discovery ("Renewed Discovery Motion") on August 12, 2021 [Doc. 40], which SCAD again opposed, [Doc. 41] and to which Mr. Payne filed a reply. [Doc. 42].

On November 5, 2021, the Magistrate Judge issued a Report and Recommendation ("R&R") ordering that the Refiled MTCA be granted and that Mr. Payne's Renewed Discovery Motion be denied. [Doc. 43]. Mr. Payne filed objections to the R&R on December 9, 2021 ("R&R Objections"). [Doc. 46]. SCAD filed its response on January 7, 2022 [Doc. 47], and Mr. Payne filed a short reply on January 21, 2022 [Doc. 49]. On March 30, 2022, District Court Judge J.P. Boulee issued an order adopting the R&R. [Doc. 50], and the Clerk of the Court entered a Judgment dismissing Mr. Payne's case the following day. [Doc. 51].[3]

---

[3] This procedural history omits other filings that are not relevant to this appeal.

## II.    Statement of the Facts

### A. Mr. Payne's Underlying Discrimination Claim

As described in the FAC, Isaac Payne, a Black man, a former United States Marine and combat veteran, and a *magna cum laude* SCAD graduate, was a successful and commended Head Coach of SCAD's Men's and Women's Fishing Teams.[4] (FAC, ¶ 23 [Doc. 13]; July 20, 2021 Decl. of Isaac Payne ("Payne Decl."), ¶¶ 2-11 [Doc. 38-2] & Payne Decl. Exs. IP-1, 2 & 6 [Docs. 38-3, 38-4, 38-5]).  He was the only Head Coach of any SCAD athletic team who was not White. (FAC, ¶ 10).

Mr. Payne faced pervasive race-based abuse, harassment, and threats of physical violence from White student-athletes. SCAD took no steps to remediate this racist abuse despite Mr. Payne's reports to SCAD management. (FAC, ¶¶25-30, 32, 35, 41, 47-48, 61).

---

[4] Among other things, four members of the Men's Fishing Team qualified for the national championship tournament in 2017. Further, two members of the Women's Fishing Team were the first women ever to qualify for a national fishing championship. In fact, the Women's Fishing Team was the first all-female fishing team in the country. (FAC, ¶ 23).

6

For example, one group of student-athletes created a "Burn Book" directed at Mr. Payne. (FAC, ¶¶ 26-29). An instigator of the "Burn Book" frequently referred to Mr. Payne as a "nigger" or "piece of shit nigger" when she was not happy with a decision Mr. Payne made. (FAC, ¶ 30). No member of the team, which was all White, told the student not to use racist language. In fact, some other members of the team laughed when the student used this language and piled on verbal abuse. (*Id.*).

Further, as is the prerogative and responsibility of collegiate coaches, Mr. Payne reasonably disciplined students and sought assistance from SCAD leadership to reign in alcohol, drug, and sexual abuse, as well as academic cheating and bribery, among a group of the student athletes on his teams. (FAC, ¶ 37). Among other things, Mr. Payne reported to SCAD an alleged sexual assault he learned about from other student athletes. (FAC, ¶ 38). The parent of one of the students alleged to have participated in the sexual assault turned on Mr. Payne after he reported the sexual assault. (FAC, ¶ 41). This parent carried a gun in an ankle holster and lifted his pant leg to show it to Mr. Payne on at least one occasion. (*Id.*). Ultimately, this parent campaigned to have Mr. Payne fired. (*Id.*). Because Mr. Payne is Black

and the students and their parents are White, SCAD took no action to support Mr. Payne or to address the misconduct he reported. (FAC ¶¶ 39-40, 42).

In another troubling series of events, when Mr. Payne disciplined a student who had missed practices, the student responded with racist threats of violence. (FAC, ¶45-55). The student started flying a large confederate flag on his pickup truck and bragged about bringing guns on campus, openly talked about carrying a firearm in Savannah because he claimed if "those people" or "niggers" "did something" or "look at me wrong," he would not hesitate to pull it. (FAC, ¶ 47). When this White student athlete went to a later meeting with Mr. Payne, in which Mr. Payne told him he would have to sit out a fishing tournament because of violations of SCAD and team rules, the White student carried a visible holstered knife, with a three-to-four-inch blade, attached to his belt. (*Id.*) During the meeting, the student menacingly said, "I know what I have to do now." (*Id.*). Mr. Payne reasonable viewed the visible knife, the timing of the student's prominent display of the confederate flag, the student's known possession of firearms, and

the student's menacing statement as a physical threat based on Mr.

Payne's race. (*Id.*).

Mr. Payne reported the threat to SCAD leadership, including the

possession and display of the knife and possession of firearms, which

violated SCAD's weapons policy. (FAC, ¶¶ 49-51). But SCAD leadership

did not take the threat seriously and did not discipline the student for

any violation of the weapons policy or his treatment of Mr. Payne. (FAC

¶ 52). Instead, the student's parent joined the other parent's campaign

to have Mr. Payne fired. (FAC ¶ 54).

In February 2018, Mr. Payne again complained to SCAD

leadership about the continuing hostile work environment and SCAD's

lack of support. (FAC, ¶61). Five days after Mr. Payne made this

complaint, SCAD fired Mr. Payne and later hired a White man to

replace him. (FAC, ¶63-68).

### B.    Arbitrability

SCAD's Alternative Dispute Resolution Policy and Agreement

("ADRPA") is contained in its Employee Handbook. [Doc 20-1 at 74].

The ADRPA provides that any arbitration "shall be conducted in

accordance with and subject to, the rules and procedures set forth in

the Arbitration Procedures," and includes an intranet address for the

Arbitration Procedures manual ("APM"). (R&R Objections, Ex. A,

Plaintiffs' ADRPA/APM Chart, ¶11(d) [Doc. 46-1].

### 1. ADRPA/APM Chart

The ADRPA has no subject headings or section numbers.

Therefore, there is no way to pin-cite specific provisions of the

ADRPA.  To aid the Court, Mr. Payne here breaks down the relevant

related subjects of the ADRPA and the APM. Mr. Payne assigns each

subject on the chart a number. Mr. Payne references the chart

throughout this brief as the "ADRPA/APM Chart" followed by the

subject number.

| Rule/ Procedure | ADRPA | APM |
|---|---|---|
| **1. Initiation of arbitration** | Employee must first meet with Vice President of Human Resources or designated representative ("HR"), initiated by "making a written request to the vice president for human resources. This request should provide a brief statement of the dispute | "A party who desires to submit a legal claim to arbitration must submit a completed Request for Arbitration to the College's Vice President of Human Resources. A copy of the Request for Arbitration form is attached to these Procedures. Copies of the Request for |

| | | |
|---|---|---|
| | and the underlying facts." ADRPA at 34. | Arbitration form may also be obtained from the Human Resources department. On the Request for Arbitration form, the party requesting arbitration must identify the legal claims to be arbitrated, the facts the party contends support such legal claims, and the relief being sought." APM at § I(A).<br><br>If the employee files a lawsuit, HR will notify the party of the ADRPA and "upon request, send the party or the party's attorney a Request for Arbitration form and arbitration will be commenced as set forth above." APM at § II. |
| **2. Internal review** | "The human resources department will conduct a review of the matter and, to the extent necessary, conduct meetings between the employee and the appropriate SCAD | No internal review contemplated. After receiving the Request for Arbitration form, the process moves into the selection of arbitrators. |

| | | |
|---|---|---|
| | representative(s) to informally resolve any differences. Employees must participate and cooperate with this internal review process prior to proceeding to the next stage of the process. The internal review process will conclude with the issuance of a letter from the vice president for human resources to the employee indicating that the internal review process has been completed." ADRPA at 34-35.<br><br>"At its option, SCAD may elect to bypass one or more steps prior to arbitration for Disputes with the employee." *Id.* | APM at §§ I and III(A)(1). |
| **3. Mediation** | "If the internal review does not resolve the Dispute, then the Dispute may, at the election of either the Employee or SCAD within the time herein | No mediation is contemplated.  After HR receives the Request for Arbitration form, the process moves into the selection of arbitrators. |

| | provided, be referred to a mutually agreed upon mediator. The cost of the mediator shall be borne by SCAD. If the matter is not resolved through mediation, the agreed upon mediator shall issue to all parties a letter indicating that the mediation process has been completed and that an impasse was reached." ADRPA at 35. | APM at §§ I and III(A)(1). |
|---|---|---|
| | "At its option, SCAD may elect to bypass one or more steps prior to arbitration for Disputes with the employee." *Id.* | |
| **4. Selection of arbitrator** | "The parties will mutually agree on an arbitrator, who must be a retired federal judge unless a retired federal judge is not available to hear the dispute in a timely manner. The selected arbitrator must have a minimum of 5 years [*sic*] experience in the substantive practice area of the Dispute or in | Parties submit a list of four proposed arbitrators each "with a minimum of five (5) years of previous experience or background in the subject matter of the arbitration. In addition, the parties agree the proposed mediators shall include as many retired federal judges as |

| | arbitrating similar types of Disputes." ADRPA at 35. | possible who are available to hear the dispute in a timely manner." APM at §III(A)(1). |
|---|---|---|
| **5. Location of arbitration** | "At the sole election of SCAD, any mediations or arbitrations conducted pursuant to this ADRPA shall be held in Savannah, Georgia, Atlanta, Georgia, or the location where the employee lives or works.[5]  If SCAD elects to conduct a mediation or arbitration in a location other than the city where the employee lives or works, the employee will be reimbursed for reasonable and necessary travel expenses incurred for travel to the mediation or arbitration…" ADRPA at 35. | "The time and place for the arbitration hearing shall be determined by the mutual agreement of the parties. If the parties cannot agree, then the Arbitrator shall consult with the parties and determine a time and place for the hearing." APM at IX(B). |
| **6. Objections to "Final** | "SCAD and the employee shall each have thirty | "A. The awards and orders of the Arbitrator |

[5] The R&R severed this sentence of the ADRPA in favor of the conflicting provision in the APM. (R&R at 42-43).

| **Determina-tion"** | (30) calendar days from the end of each step in this ADRPA process to notify the other that they are not satisfied with the resolution at that stage of the ADRPA and wish to proceed to the next stage of the process. A failure to notify the other party, in writing, within thirty (30) days of the Final Determination of the internal review, mediation or arbitration shall be deemed a waiver of any right to continue the ADRPA process with respect to the Dispute at issue and shall be deemed a final conclusion and resolution of the Dispute."  ADRPA at 35. | shall be final and binding unless, within thirty (30) days of service of the Arbitrator's final award, a party serves notice to the other parties of the arbitration of the intent to appeal the Arbitrator's awards and orders to a second Arbitrator. The second Arbitrator shall be selected in the same manner as the initial Arbitrator. |
| | | B. The second Arbitrator shall decide the appeal proceeding as far as practicable according to the law and procedures applicable to appellate review by a United States Court of Appeals of a civil judgment following a nonjury decision by a judge. |
| | "At its option, SCAD may elect to bypass one or more steps prior to arbitration for Disputes with the employee." *Id.* | C. The result of the appeal and any further proceedings pursuant to the appeal shall then constitute the final |

15

| | | |
|---|---|---|
| | | Award, which may be enforced, vacated or modified by a court as provided by law.<br><br>D. The costs and expenses of the second Arbitrator shall be apportioned among all parties according to the number and breadth of the issues being appealed by each party. The second Arbitrator shall make this determination." APM at § XI. |
| **7. Attorneys'/ expert fees; costs of arbitration** | "Attorney's fees, expert witness fees, and costs shall be paid by the respective parties unless the arbitrator awards otherwise. In making his/her award, the arbitrator shall require the non-prevailing party to bear the cost of the arbitrator's fees, provided however, that SCAD will advance the cost of the arbitrator's fees at the | "Any party entitled to an award of reasonable attorney's fees and/or costs under the law governing the claim being arbitrated is entitled to such costs and/or fees upon a proper showing under the legal standards applied to award of such costs or fees." APM at § XII(B). |

16

| | initiation of the arbitration, subject to reimbursement by the employee following arbitration if the employee does not prevail." ADRPA at 35 | "The non-prevailing party shall bear pay the Arbitrator's fees. In making his/her award, the Arbitrator shall require the non-prevailing party to bear the cost of the Arbitrator's fees, provided however, that the College will advance the cost of the Arbitrator's fees at the initiation of the arbitration, subject to reimbursement by the nonprevailing party following arbitration." APM at § XII(A). |
| --- | --- | --- |

| | | |
|---|---|---|
| **7(a).Discovery, generally** | "The parties agree that the arbitration shall be conducted in accordance with and subject to, the rules and procedures set forth in the Arbitration Procedures." ADRPA at 35. | "Except as otherwise provided by these Procedures, discovery and depositions shall be conducted in accordance with Rules 26 through 37 of the Federal Rules of Civil Procedure." APM at § VII(A)(1). |
| **7(b).Discovery, subpoenas** | "The parties agree that the arbitration shall be conducted in accordance with and subject to, the rules and procedures set forth in the Arbitration Procedures." ADRPA at 35. | "Nothing in the Alternative Dispute Resolution Policy and Agreement claims or these Procedures shall prohibit or limit a party from petitioning a court of competent jurisdiction to compel a nonparty to respond to discovery requests or to appear for a deposition, in the event that the Arbitrator is unable to compel the non-party to do so." APM at § VII(B)(7). |
| **7(c).Discovery, interference with witness cooperation** | "The parties agree that the arbitration shall be conducted in accordance with and subject to, the rules and procedures set | "A party who identifies a witness during discovery must request the witness to cooperate by appearing for a deposition and |

| | | |
|---|---|---|
| **with discovery demands** | forth in the Arbitration Procedures." ADRPA at 35. | producing documents, if such discovery is demanded by a party or by the arbitrator. If a party does not make such a request or if a party takes any action to discourage a witness from cooperating with discovery demands, the Arbitrator shall preclude the party from calling the witness at the arbitration hearing, unless the party can demonstrate to the Arbitrator a substantial justification for the party's actions." APM at § VII(B)(6). |
| **8. Identifica-tion of witnesses** | Not indicated. | "A witness called by a party to testify at the arbitration hearing must have been identified during discovery in response to interrogatories or other disclosures. The failure to identify a witness during discovery shall |

| | | |
|---|---|---|
| | | preclude the party from calling the<br><br>witness at the arbitration hearing, unless the party can demonstrate to the Arbitrator a substantial justification for the failure." APM at VII(B)(5). |
| **9. Applicable ADRPA/APM** | "SCAD retains the right to modify or terminate this ADRPA and the Arbitration Procedures on thirty days' written notice. The policy, if any, in effect at the time a request for mediation and/or arbitration is initiated, will govern the process by which the Dispute is resolved." ADRPA at 36. | "The College may revise these Procedures as it deems necessary and consistent with the interest of fairness. No such revision, however, will apply to any claim which has been submitted to arbitration prior to the date on which the revision is communicated to the parties." APM at XX. |

20

### 2. The ADRPA and APM in Relation to Mr. Payne's Claims.

The ADRPA provides that the arbitrator "must be a retired federal judge," with the only exception being "unless a retired federal judge is not available to hear the dispute in a timely manner." (ADRPA/APM Chart, ¶ 4). Further, the non-prevailing party must pay the arbitrator's fees. (ADRPA/APM Chart, ¶7). Taken together, these two provisions and record evidence from an expert witness demonstrate that arbitrator fees for a retired federal judge to conduct this arbitration are likely to exceed $39,600. [Doc. 39-11, ¶ 23]. The record also contains evidence that SCAD has used the cost-shifting terms to deter another Black former employee from pursuing an arbitration seeking damages for alleged race discrimination. [Doc. 38-9, ¶ 9-14; Doc. 38-10, p. 9-11 (requiring claimant in arbitration to read fee-shifting provision during deposition for no apparent reason other than to intimidate him; claimant agreed to settle claim for no damages in exchange for SCAD's agreement not to pursue arbitration fees)].

ADRPA allows "SCAD [to] retain[] the right to modify or terminate this ADRPA and the Arbitration Procedures on thirty days' written notice. The policy, if any, in effect at the time a request for

21

mediation and/or arbitration is initiated, will govern the process by which the Dispute is resolved." [Doc. 20-1 at 75]. In August 2019, SCAD modified the ADRPA. [Doc. 39-1, ¶ 3]. Most of the 2019 changes were stylistic. However, significantly, SCAD added a paragraph awarding attorneys' fees and costs of litigation to the "prevailing party" if a party files a suit in court to resolve claims that are subject to the ADRPA. (*Id.* at 41-43]. This was in addition to shifting of the arbitrator's fees and costs, which was carried over from the 2015 ADRPA. (*Id.*). SCAD has admitted that Plaintiff was never given notice of those changes. [Doc. 35-1, ¶ 5].

On August 6, 2020, Mr. Payne, through counsel, sent a letter to SCAD leadership raising Mr. Payne's claims of discrimination. [Doc. 38-2, ¶ 41; Doc. 38-8]. In response, on August 21, 2020, SCAD's counsel sent an email insisting that the claims should be arbitrated. [Doc. 38-12, ¶ 3(a); Doc. 38-13 at 2]. The parties do not dispute—and the court below agreed—that SCAD's August 21, 2020 email constituted the operative request that Mr. Payne arbitrate his claims. ([Doc. 35 at 1-2] & R&R at 9-10). As set forth below, this date is critical to the Court's

examination of which version of the ADRPA, if any, would apply to Mr.

Payne's claims. *See infra* at 54-56.

### 3. SCAD's Witness Interference.

The academic year after SCAD terminated Mr. Payne, SCAD disbanded the Fishing Teams. (FAC ¶69). Noah Pescitelli, a member of the team who received an athletic scholarship, had lodged complaints with SCAD leadership raising concerns about some of the same issues Mr. Payne had raised. (Payne Decl. ¶35 [Doc. 38-2]). When Mr. Pescitelli left the Fishing Team due to intolerable conditions, representatives of SCAD asked him to sign a "Confidential Settlement Agreement" releasing SCAD from any claims and agreeing to a strict confidentiality provision prohibiting disclosure of, among other things, "the facts and circumstances concerning this Agreement." (*Id.* ¶37 & Ex. IP-5). This confidentiality requirement would have prevented Mr. Pescitelli from voluntarily cooperating with Mr. Payne's case. (*Id.*)  In exchange for signing the Agreement, Mr. Pescitelli would continue to receive his athletic scholarship of $36,630 for the following academic year. (Payne Decl. ¶ 37).  SCAD acknowledges it made this offer to Mr. Pescitelli. (Apr. 23, 2021 Decl. of Phil Alletto ¶11 ("Alletto Decl.") [Doc.

28-1]. As of July 2021, Mr. Pescitelli refused to sign the Agreement. (Payne Decl. ¶ 38). As a consequence, he lost his scholarship. (*Id.*; Alletto Decl. ¶ 12).

## III.    Standard of Review

This Court has held that "a summary judgment-like standard" applies to the question of whether an enforceable arbitration agreement exists between parties. *Bazemore v. Jefferson Cap. Sys.*, LLC, 827 F.3d 1325, 1333 (11th Cir. 2016). Therefore, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Id.* However, if there are genuine disputes of material fact, the Eleventh Circuit should not take it upon itself to resolve them. Rather, the matter should be remanded to the district court for a jury trial.[6] *See* 9 U.S.C. § 4 (party challenging "making of the arbitration agreement … may demand a jury trial of such issues…."); *contra Reiterman v. Abid*, 26 F.4th 1226, 1233 (11th Cir. 2022) (evidentiary hearing sufficient where party did

---

[6] Mr. Payne has demanded a trial by jury on arbitrability. (FAC, ¶ 138 [Doc. 13]).

not request a "trial"); *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1348

(11th Cir. 2017) (bench trial held on arbitrability questions; a *general*

jury demand is not sufficient to invoke the jury trial right under 9

U.S.C. §4; the demand must be specific to Section 4 of the FAA).

The Eleventh Circuit reviews *de novo* an order granting a motion

to dismiss a complaint and compel arbitration. *Young v. Grand Canyon*

*Univ., Inc.*, 980 F.3d 814, 818 n.3 (11th Cir. 2020) (citing *Cruz v.*

*Cingular Wireless, LLC*, 648 F.3d 1205, 1210 (11th Cir. 2011)).

## SUMMARY OF THE ARGUMENT

The district court committed four eversible errors in this case.

The district court erred in determining that the arbitration

agreement was enforceable and not unconscionable, erred in failing to

find that SCAD waived its right to arbitrate, and further erred in not

permitting Mr. Payne to take limited discovery on issues relating to

arbitrability.  Further, the district court should have found (or should

find on remand) the entire arbitration agreement is unenforceable,

rather than severing unconscionable terms.

Courts routinely recite a federal "policy favoring arbitration";

however, as the Supreme Court recently held, "[t]he federal policy is

about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022). The court below, in granting SCAD's Refiled MTCA, strayed outside the confines of Georgia contract law. Because SCAD's contract terms have gone beyond the outer limit of what the law allows, they are unconscionable and therefore cannot be enforced.

The arbitration agreement at issue here contains several provisions that so deeply impact the substantive rights of employees that the district court erred as a matter of law in failing to find them unconscionable. *First*, the agreement shifts the arbitrator's fees and costs to the non-prevailing party; a sum so substantial that it will effectively prevent Mr. Payne from vindicating his rights under the Section 1981. *Second*, in violation of legal standards the agreement permits the employer to unilaterally determine the pool of arbitrators and limit that pool to just two individuals, former federal judges in Georgia, who are both White. *Third*, the agreement to arbitrate is unconscionable because it is illusory, indefinite, and lacks mutuality. Further, these unconscionable terms should not be severed, but rather should make the entire agreement unenforceable. Severing the terms

26

impermissibly would require rewriting the agreement, and they are so one-sided that they undermine the neutrality of the arbitration process.

The district court also erred when it held that SCAD had not waived its arbitration rights by attempting to make a key witness sign a confidentiality agreement, which would have prevented his participation in arbitration discovery, in exchange for a continuation of his athletic scholarship after the Fishing Teams were disbanded. Alternatively, the district court should have permitted Mr. Payne to take discovery regarding SCAD's communications with other former team members.

Finally, and relatedly, the district court should not have denied Mr. Payne's Renewed Discovery Motion, to the extent there are disputed facts that are material to the questions of arbitrability.

ARGUMENT AND CITATIONS OF AUTHORITY

**I.    The District Court Erred in Determining That the Arbitration Agreement Is Not Unconscionable.**

**A.    Standard for Unconscionability.**

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, a federal court may apply state law to invalidate an arbitration agreement, "provided the law at issue governs contracts generally and not

27

arbitration agreements specifically." *Bess v. Check Express*, 294 F.3d 1298, 1306 (11th Cir. 2002) (citing *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686–87 (1996) ("generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements")).

Under Georgia law, unconscionability may be either procedural or substantive. "A non-inclusive list of some factors courts have considered in determining whether a contract is procedurally unconscionable includes the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *NEC Techs., Inc. v. Nelson*, 267 Ga. 390, 392, 478 S.E.2d 769, 771–72 (1996). "As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.*

"[T]he basic test for determining unconscionability is 'whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *Dale v. Comcast Corp.*, 498 F.3d 1216, 1219 (11th Cir. 2007), citing *NEC Techs.*, 267 Ga. at 478 (internal citations omitted). While Georgia law contemplates both types of unconscionability, both need not be present in the same quantum to render a contract unconscionable.[7] For example, in *Dale*, the Eleventh Circuit held that a provision was substantively unconscionable and thus unenforceable, without addressing the appellants' argument that the provision was also procedurally unconscionable. *See id.* at 1219-20 & n.5.

In the context of arbitration agreements, courts have observed that "[b]y agreeing to arbitration in lieu of litigation, the parties agree

---

[7] Even if the Court determines Georgia require requires both procedural and substantive unconscionability, the indefinite and non-mutual terms of the ADRPA and APM, as laid out in detail below, make the agreement to arbitrate procedurally unconscionable. *See Mullis v. Speight Seed Farms, Inc.*, 234 Ga. App. 27, 29 (1998) ("comprehensibility of the contract language" is an element of procedural unconscionability).

to trade the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration, but they do not accede to procedures utterly lacking in the rudiments of even-handedness." *Cannon v. S. Atlanta Collision Ctr.*, No. 1:11-CV-1030-TWT-ECS, 2012 WL 1004914, at *5 (N.D. Ga. Feb. 27, 2012), *report and recommendation adopted*, No. 1:11-CV-1030-TWT, 2012 WL 996696 (N.D. Ga. Mar. 22, 2012) (declining to enforce arbitration agreement) (quoting *Nino v. Jewelry Exchange*, 609 F.3d 191, 204 (3rd Cir.2010) (same) (quoting *Murray v. United Food & Commercial Workers Intern.*, 289 F.3d 297, 303 (4th Cir.2002) (same)).

### B.    The Excessive Cost-Shifting Provisions Prohibit Mr. Payne from Vindicating His Rights.

The ADRPA's provision requiring the non-prevailing party to be fully responsible for paying the arbitrator's fees and costs serves no purpose other than to dissuade potential claimants from pursuing their rights under the law. Indeed, Mr. Payne has provided a detailed declaration about his finances demonstrating that he will be forced to give up his claims due to this risk if he is required to arbitrate, an expert declaration setting forth the costs of arbitration, and a declaration and related deposition testimony from another Black former

30

SCAD employee who SCAD bullied into dropping his arbitration by weaponizing the cost-shifting provision.

The court below in effect disregarded Mr. Payne's evidence wholesale, instead concluding that he did not show he was "likely" to bear these costs. However, if Mr. Payne's great lengths to show the harm of the cost-shifting are not sufficient, shifting of any costs or fees to the non-prevailing party, no matter how extreme, would be permissible.[8] That cannot be the rule of this Court.

The court below found Mr. Payne did not meet his "burden of establishing that enforcement of the agreement would 'preclude' him from 'effectively vindicating [his] federal statutory right in the arbitral forum.'" (R&R at 55 [Doc. 43], quoting *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255 (11th Cir. 2003) (quoting *Green Tree Fin. Corp. – Alabama v. Randolph*, 531 U.S. 79, 90 (2000); Opinion at 8 [Doc. 50] (adopting R&R's conclusions)). Relying exclusively on *Musnick*, the R&R concluded that Mr. Payne had failed to "*demonstrate*

---

[8] For example, an arbitration agreement could impose a mandatory multiplier on fees charged to a non-prevailing party. So long as the obligation to pay of multiples upon the fees was contingent on the party losing, it would be permissible under the district court's reasoning.

that he is *likely* to bear such prohibitive arbitration costs." Report at 55 (quoting *Musnick*, 325 F.3d at 1258) (emphasis in original).

However, the court erred in three respects: (1) the cost-shifting is not speculative, as the ADRPA shifts the arbitrator's fees, rather than statutory attorneys' fees and costs, to the non-prevailing party, and this is a non-discretionary contractual obligation; (2) Mr. Payne satisfies the proof standard set forth in *Musnick*; (3) the Court's evaluation of the likelihood of bearing such costs must take into consideration the inherent risks of employment discrimination arbitration and the employee's reasonable perception of that risk; and (4) any right of appeal to a second arbitrator would only increase the likely costs, and the success of a further appeal to the district court is miniscule in light of *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008), which abrogated *Musnick* in relevant part.

### 1. The Nature of the Cost-Shifting

As an initial matter, the court below in error suggested "it is not guaranteed that an arbitrator would even be bound by the language of the cost-shifting provision…, which makes it even more difficult to speculate whether Plaintiff is likely to pay the allegedly prohibitive

arbitrator's fees." (R&R at 57 (citing *Musnick*, 325 F.3d at 1261 n.7)). However, *Musnick*, addresses a somewhat different cost-shifting issue than is now before the Court.

In *Musnick*, this Court reviewed an arbitration agreement with a "loser pays" provision for *statutory attorneys' fees and costs* in a case under Title VII. *Musnick*, 325 F.3d at 1259-1260. Therefore, where statutory attorneys' fees and costs are at stake, it would be appropriate for the arbitrator to consider whether a shift of these obligations to a non-prevailing employee would contravene his substantive rights under Title VII. *Id*. SCAD's ADRPA, however, mandates that the non-prevailing party pay the *arbitrator's* fees, while it instructs the arbitrator to award attorneys' fees and costs "under the legal standards applied to award of such costs or fees." ADRPA/APM Chart ¶7.

The arbitrator is thus likely to view cost shifting as a question of contractual obligation, as opposed to one of a substantive statutory right, if the Court determines the arbitration fee shifting provision is not unconscionable. Notably, the other circuits' holdings referenced in the *dicta* footnote in *Musnick*, which the R&R cites, all address substantive rights, as opposed to contractual obligations. *See Great*

33

*Western Mortg. Corp v. Peacock*, 110 F.3d 222, 230-31 (3rd Cir. 1997)(waiver of punitive damages in state law claim); *Larry's United Super, Inc. v. Werries*, 253 F.3d 1083, 1085-86 (8th Cir. 2001)(waiver of punitive damages in RICO claim); *MCI Telecommunications Corp. v. Matrix Commc'ns Corp.*, 135 F.3d 27, 33 n.12 (1st Cir. 1998) (waiver of claim to "multiple damages").

In *Crespo v. Kapnisis,* No. 21-CV-6963 (BMC), 2022 WL 2916033, at *6 (E.D.N.Y. July 25, 2022), the Eastern District of New York very recently found "it is sufficient for an employee seeking to avoid arbitration to show a likelihood that he or she will be responsible for significant arbitrators' fees, or other costs which would not be incurred in a judicial forum." *Id.* (quoting *Ball v. SFX Broad., Inc.*, 165 F. Supp. 2d 230, 240 (N.D.N.Y. 2001). Notably, the court in *Crespo* found the employer's requirement that the arbitrator be "a retired judge with 'at least ten (10) years or [*sic*] legal experience," is particularly onerous because "the fees of such an arbitrator are likely to be substantial." *Id.* This provision is similar to the arbitrator selection mandate in SCAD's ADRPA (ADRPA/APM Chart ¶ 4),

Finally, the ADRPA's scheme to shift the arbitrator's costs is an

outlier that is inconsistent with the standard rules for employment

cases of AAA and JAMS, the two largest arbitration services providers.

Both explicitly require employers, not employees, to pay the

professional fees for the arbitrators' services. JAMS's Policy on

Employment Arbitration Minimum Standards of Procedural Fairness,

provides that:

> [a]n employee's access to arbitration must not be
> precluded by the employee's inability to pay any costs
> or by the location of the arbitration. The only fee that
> an employee may be required to pay is JAMS' initial
> Case Management Fee. All other costs must be borne
> by the company, including any additional JAMS Case
> Management Fee and all professional fees for the
> arbitrator's services.

*Id., available at* https://www.jamsadr.com/employment-minimum-

standards/. Similarly, under the AAA Employment/Workplace Fee

Schedule:

> [t]he employer or company shall pay the arbitrator's
> compensation unless the employee or individual, post
> dispute, voluntarily elects to pay a portion of the
> arbitrator's compensation.

*Id., available at* https://www.adr.org/sites/default/files/Employment_

Fee_Schedule1Nov19.pdf.

## 2. The Adequacy of Mr. Payne's Proof of Prohibitive Costs

Mr. Payne has more than sufficiently shown shifting the costs of arbitration would be prohibitive. Therefore, the court below erred when it determined the cost-shifting provision was not unconscionable.

In *Musnick*, the plaintiff's showing that costs would be prohibitive was limited to the following statement in his supporting affidavit:

> I genuinely fear the imposition of attorney's fees from Fisher & Phillips, as I am familiar with their billing sent to King Motors. Fisher & Phillips' hourly rate is high, and I imagine it will be higher when billed to an opponent.... I am fearful of a potential attorney's fee award against me.... I will be unable to pay.

*Musnick*, 325 F.3d at 1260. The Eleventh Circuit found this affidavit was:

> wholly inadequate to establish that the arbitration would result in prohibitive costs that force him to relinquish his claim under Title VII… He has adduced no evidence whatsoever to support this claim. As a result, the risk alleged by Musnick is simply too "speculative" to render his agreement to arbitrate unenforceable….

*Id.* (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 610 (3d Cir. 2002); *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000)). Still, *Musnick* left room for a sufficient factual showing,

36

opting not to remand the case to the district court for fact-finding on the "prohibitive costs" issue because "Musnick has had his opportunity to make a record on this issue and he did not." *Musnick,* 325 F.3d at 1260; *cf. Dedmon v. OKC Southern Hills Investments, LLC*, Case No. CIV-21-00073-PRW, 2021 WL 5234556 (W.D. Ok. Nov. 9, 2021) (severing cost-shifting provision where plaintiff "submitted emails with potential arbitrators as well as governing arbitration rules and mediation procedures showing the likely arbitration costs and fees. . . [and] an affidavit showing she cannot afford to pay her portion of these costs").

In stark contrast, here Mr. Payne has satisfied his burden by supplying supplementary documentation "establish[ing] that the arbitration would result in prohibitive costs that force him to relinquish his claim." *Musnick*, 325 F.3d at 1260.

### a. The Expert Declaration of Professor Imre S. Szalai

Mr. Payne has proffered the affidavit of Professor Imre S. Szalai, a tenured professor of law whose scholarship focuses on arbitration, detailing the likely costs of arbitrating Mr. Payne's claims. Professor Szalai explained that resolving the case through a hearing on the merits before an arbitrator would likely cost $39,600, if not more for a

retired federal judge, not factoring the arbitrator's expenses, rental space, and administrative or filing fees. (Mar. 25 Decl. of Imre Szalai ("Szalai Decl.") ¶¶9-13, 18-24 [Doc. 38-11]). Similarly, appellate arbitration, as allowed under the APM, would cost an additional $300- to $600 per hour, or again more for a retired federal judge. (*Id.*, ¶25). As Professor Szalai notes, the arbitrator's fees are "[t]he largest cost component of an arbitration lacking a counterpart in litigation." (*Id.*, ¶12).[9]

The court below disregards Professor Szalai's declaration beyond noting its submission and Mr. Payne's reliance on it. However, the expert declaration shows—and SCAD does not refute this— "it is clear that Plaintiff is correct about the cost of arbitration." *Crespo*, 2022 WL 2916033, at *6.

### b. Mr. Payne's Detailed Financial Declaration.

Second, Mr. Payne has demonstrated in detail the effect of such costs on his family. His declaration sets forth each of his family's

---

[9] The R&R acknowledges Mr. Payne "goes further than the plaintiff in *Musnick*, submitting a declaration from an expert estimating the arbitrator's fees that might be shifted to him if he does not prevail at arbitration." (R&R at 56).

various sources of household income, enumerates his family's monthly expenses, and explains the reasons for certain past expenses and anticipated future expenses. (Payne Decl. ¶¶ 45-60 [Doc. 38-2]). Mr. Payne concludes that he simply cannot afford to arbitrate his claims because the arbitrator's fee-shifting provision results in a substantial risk that he would lose years of savings that would be financially disastrous for his family. (*Id.*).

Yet, though Mr. Payne goes far beyond the factual showing in *Musnick*, the R&R incorrectly concluded the cost-shifting was not unconscionable because, even "taking as true his declarations regarding his ability to pay such estimated fees… [, the] Court cannot predict whether Plaintiff is *likely* to prevail on the merits of his § 1981 claims." (R&R at 57).

### c. Darnell Holcomb's Declaration.

Finally, former employee Darnell Holcomb's declaration and accompanying deposition excerpt show SCAD's treatment of other employees during the discovery phase of an arbitration. Mr. Holcomb's submissions demonstrate that SCAD has included this provision so it can aggressively use the contractual obligation to shift these onerous

fees as a weapon to dissuade employees from vindicating their legal rights. (March 24, 2021 Decl. of Darnell Holcomb ("Holcomb Decl.") [Doc. 38-9] & Ex. H-1 [Doc. 38-10] ("Holcomb Dep.")).

Mr. Holcomb, SCAD's former Director of Giving, who also is a Black man, brought arbitration against SCAD similarly alleging race-based discrimination. (Holcomb Decl. ¶¶1-7). In SCAD's deposition of Mr. Holcomb, SCAD's counsel made Mr. Holcomb read the section of the ADRPA SCAD's counsel had highlighted and asked, "So do you understand that in the event that you do not prevail in this arbitration, that you will be responsible for the arbitrator's fees in this case?" (Holcomb Dep. at 164:11-165:13). Though Mr. Holcomb's attorney objected that SCAD was trying to scare and intimidate Mr. Holcomb, (*Id.* at 165:14-166:180, SCAD's counsel forced Mr. Holcomb to respond, doubling down on the threat of cost-shifting by threatening that bringing this challenge to the arbitrator would cost Mr. Holcomb even more money. (*Id.* at 165:22-166:8). Ultimately, when faced with what he understood to be the possibility of as much as $200,000 in the arbitrator's fees and costs, Mr. Holcomb withdrew his arbitration; a

40

decision he would not have made but for the cost-shifting. (Holcomb Decl. ¶9-14].

The R&R characterizes Mr. Holcomb's submissions as "completely unhelpful," that his experience has "no bearing on whether SCAD will attempt to enforce the cost-shifting provision here…," R&R at 58, and that, in the context of the R&R's recommendation on discovery, it "would have no predictive value." R&R at 76.

However, the district court addressed the wrong question in asking whether SCAD "will attempt to enforce" the fee-shifting provision. The evidence shows it does not have to seek enforcement because the mere presence of that provision leads potential claimants to abandon their claims rather than arbitrate them. Therefore, Mr. Payne's decision not to pursue arbitration because "I am not willing to, and I cannot afford to, risk my livelihood and my family's livelihood to have my case heard in arbitration," (Payne Decl. ¶ 60 [Doc. 38-2]) is not based on conjecture. At a minimum, Mr. Payne should be able to take discovery regarding SCAD's antics in other arbitrations. *See Bazemore*, 827 F.3d at 1333 & *infra* at 67-68.

### 3. The Inherent Risks of Employment Discrimination Arbitration.

Mr. Payne has also put evidence into the record about the substantial likelihood that he will lose his case before an arbitrator. This is not because of the relative merits of his underlying discrimination claims, but because researchers have found employees' cases in arbitration are strikingly unlikely to succeed. According to a recent report by the American Association for Justice that examined data from AAA and JAMS, the two largest arbitration providers, over a five-year period "only 2.5% of employment cases resulted in an employee award (that was not outweighed by an even larger employer award)." *The Truth About Forced Arbitration*, American Association for Justice (Sept. 2019), https://bit.ly/3oDtDK4 (last reviewed July 24, 2022) at 29. Just 282 employees were awarded any monetary damages out of 11,114 who submitted claims to arbitration. *Id.* at 7. A comparison of outcomes for employment discrimination claims brought in federal court and those brought in arbitration revealed that employee-plaintiffs were 59% more successful in court than in private arbitration. Katherine V.W. Stone, et al., *The Arbitration Epidemic*, EPI Briefing Paper, Economic Policy Institute (Dec. 7, 2015),

42

https://bit.ly/3GownB0 (last reviewed Nov. 26, 2021), at 19 (citing

Eisenberg, Theodore, et al., *Arbitration and Litigation of Employment*

*Claims: An Empirical Comparison*, Dispute Resolution Journal 58(4):

44–55 (2003)).

Whether viewed subjectively through Mr. Payne's lens—his own

financial constraints that have led him to decide not to pursue

arbitration are real—or objectively based on actual outcomes in

arbitration, Mr. Payne is not likely to prevail in arbitration.  The court

below erred by not considering this in determining the likelihood that

Mr. Payne would bear the costs of arbitration.

### 4. The Prohibitive Cost of Appeal to a Second Arbitrator, and the Miniscule Chance of Success on Further Appeal to the District Court.

If the arbitrator were to rule against Mr. Payne on the merits and

thus shift the arbitrator's costs to Mr. Payne, his next option would be

to appeal to a second arbitrator. (ADRPA/APM Chart at ¶6). The cost of

appellate arbitration similarly would be Mr. Payne's to bear. (*Id.*).[10] As

---

[10] Though the APM has the second arbitrator's costs "apportioned among all the parties according to the number and breadth of the issues being appealed by each party," (*Id.*), if Mr. Payne were appealing an

Professor Szalai indicated, the second arbitrator would charge similar rates. (Szalai Decl. ¶25 [Doc. 38-11]). The district court erred by not considering the cost of appellate arbitration.

However, the district court's greater error was in its review of Mr. Payne's potential appeal to a court of law. The district court "[did] not see such a restriction in the agreement. In fact, the Arbitration Procedures say that… [the second arbitrator's] decision 'may be enforced, vacated or modified by a court as provided by law.'" R&R at 57-58 n.17 (quoting APM Part XI.A-C). However, it is the law that severely limits any right of appeal to a court; a standard of review that is now even more restrictive than what the *Musnick* court reviewed.

The standard for vacating an arbitrator's decision is extraordinarily difficult to meet. Section 10 of the Federal Arbitration Act ("FAA") provides four bases for a court to vacate an arbitration award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the

---

adverse merits ruling, the cost would be apportioned entirely to him. Based on the language of this provision, the costs would be split in some form only if, for example, SCAD were to cross-appeal certain issues.

arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). While the Eleventh Circuit previously had allowed vacatur where an arbitrator behaved in "manifest disregard of the law," *see B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 910 (11th Cir. 2006), it has recognized that even this challenging standard was abrogated by the U.S. Supreme Court's ruling in *Hall Street Assoc.*, 552 U.S. 576 at 581. *See, e.g. S. Commc'ns Servs., Inc. v. Thomas*, 720 F.3d 1352, 1358 (11th Cir. 2013) ("'judicially-created bases for vacatur' that we had formerly recognized, such as where an arbitrator behaves in manifest disregard of the law, 'are no longer valid.'") (quoting *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1324 (11th Cir.2010)). Even an "incorrect legal conclusion" is not a basis for vacatur. *Id.*

*Musnick,* which pre-dated *Frazier* and *S. Commc'ns Servs., Inc.*, adopted the "manifest disregard of the law" standard for vacating

45

arbitration awards. *Musnick*, 325 F.3d at 1261. Because the Eleventh Circuit since has held the "manifest disregard" standard is no longer applicable, its related analysis and conclusions in *Musnick* arguably also are no longer applicable.

For these reasons, any appeal would not alter the calculation of Mr. Payne's likely obligation to pay the arbitrator's costs.

## C.    The Selection-Of-Arbitrator Provision Is Unconscionable.

By requiring the parties to use a retired federal judge as an arbitrator for an arbitration that would have to be venued in Georgia, SCAD's ADRPA and APM effectively limit the pool of arbitrators to two White men.  Federal courts uniformly have determined that contract provisions placing draconian limits on the number of prospective arbitrators or pre-select one party's choice of arbitrators are unconscionable. The court below erred when it determined the ADRPA and APM's process for selection of an arbitrator was not unconscionable. That both arbitrators are White underscores this unconscionability.

## 1. The ADRPA and APM's Terms for Selection of an Arbitrator.

Both the R&R and Opinion misread the terms of the ADRPA and the APM. The district court concluded the agreement "does not strictly limit the pool of potential arbitrators." (R&R at 64 [Doc. 43]; Opinion at 9 [Doc. 50] (reciting the parties' arguments and agreeing with the R&R's reasoning)). This is incorrect.

The ADRPA on its face provides that the arbitrator, "*must* be a retired federal judge *unless* a retired federal judge is not available to hear the dispute in a timely manner." (ADRPA/APM Chart, ¶ 4 (emphasis added) [Doc. 46-1]). The Opinion suggests that the "unless…" clause makes the selection of a retired federal judge merely permissive, indicating other arbitrators may be selected under "certain circumstances." [Doc. 50 at 8]. However, Mr. Payne has alleged, citing data from two arbitration organizations that make their roster of arbitrators publicly available, that two retired federal judges are

47

available in Georgia, (FAC at ¶ 107 [Doc. 13]), and SCAD does not refute this with any reference to a source of authority.[11]

As for whether the arbitrator must be in Georgia, the Magistrate Judge struck the provision of the ADRPA giving SCAD "sole election" of the arbitration venue in favor of broader a "facially contradictory" provision in the APM. (R&R at 42-43 [Doc. 43]).[12] However, this does not mean the arbitration feasibly could take place anywhere other than Georgia where SCAD, the evidence, and presumably most witnesses—in a case that will rely heavily on witness testimony—are located. Further, neither the ADRPA nor the APM provide for remote hearings, as suggested in the Opinion. [Doc. 50 at 9].

The Court cannot inject cures into an ailing arbitration agreement; it is bound by the four corners of the contract. Any ambiguity in the contract's terms must be construed against SCAD, as the drafting party. *See First Acceptance Ins. Co. of Georgia, Inc. v.*

---

[11] The Opinion accepts SCAD's insinuation that "other types of [retired] federal judges" (non-Article III judges) are available, [Doc. 50 at 9], though SCAD provides no support for this conclusion.

[12] Mr. Payne addresses this, below, in support of his position that unconscionable terms cannot be severed, but rather the contract as a whole cannot be enforced. *See infra* at 60-63.

48

*Hughes*, 305 Ga. 489, 496, 826 S.E.2d 71, 77 (2019) (quoting O.C.G.A. §13-2-2(5) ("If an agreement 'is capable of being construed two ways, it will be construed against the preparer and in favor of the non-preparer.'"). The lower court erred as a matter of law in rejecting established Georgia law governing the interpretation of all contracts and instead held that the ADRPA should be interpreted in favor of SCAD because "the federal court's policy favoring arbitration must still be considered when applying state laws of contractual interpretation to an arbitration agreement governed by the FAA." [Doc. 43, p. 23]. However, *Morgan v. Sundance* requires that federal courts "make 'arbitration agreements as enforceable as other contracts, but not more so.'" 142 S.Ct. at 1713 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12, (1967)). *See also Bess*, 294 F.3d at 1306 ("FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically").

Accordingly, the district court should not have accepted SCAD's alternate reading of the arbitrator selection provisions.

49

## 2. The method of selecting arbitrators is unconscionable because it is unilateral

The ADRPA is unconscionable because its method of selecting arbitrators gives SCAD unilateral control to select the arbitrator. However, neither the R&R nor the Opinion addressed Mr. Payne's legal argument in this respect, instead accepting SCAD's contention that a broader pool of arbitrators is available. [Doc. 43 at 63; Doc. 50 at 9]. The district court's failure to find that this provision is unlawful thus fails as a matter of law.

"Courts of Appeals have not hesitated to conclude that provisions in arbitration agreements that give the employer an unreasonable advantage over the employee in the selection of an arbitrator are unconscionable." *Nino*, 609 F.3d 191 at 204 (finding unconscionable arbitration selection clause in which employer strikes two and employee strikes one from list provided by AAA). *See also Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938–39 (4th Cir. 1999) (refusing to enforce arbitration agreement where, among other terms "so one-sided that their only possible purpose is to undermine the neutrality of the proceeding" was a requirement that two of three arbitrators "must be selected from a list of arbitrators created exclusively by [the

50

employer]"); *Murray*, 289 F.3d at 303 (arbitration agreement "utterly lacking in the rudiments of even-handedness" where employer was solely responsible for creating initial list of potential arbitrators) (internal quotation and citation omitted). Further, as the Northern District of Georgia has noted, "[c]ourts have not hesitated to conclude that provisions in arbitration agreements that give the employer such an unfair advantage over the employee in the selection of an arbitrator are unconscionable." *Cannon*, 2012 WL 1004914, at *5 (finding unconscionable selection of arbitrator provision that effectively limited potential pool to employer-side employment lawyers and excluded employee-side lawyers).

Therefore, the Court should find that the arbitrator selection process is unconscionable on this basis alone.

### 3. The Method of Selecting Arbitrators Is Unconscionable Because It Excludes Any Arbitrators Who Are Not White

The arbitrator-selection provision is so one-sided as to be unconscionable because its limitation to the two individuals who satisfy the description guarantees that the arbitrator hearing the race discrimination claim will be a White male. (Doc. 13, ¶ 107).

51

Courts have recognized the importance of a claim being heard by a factfinder from a community. As the United States Supreme Court has reasoned in the analogous situation of jury selection, "selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson v. Kentucky*, 476 U.S. 79 (1986). Georgia likewise recognizes the importance of ensuring that the right to a factfinder drawn from a pool of citizens that represents the community to ensure that parties from all backgrounds receive equal treatment in litigation. *See Flanders v. State*, 279 Ga. 35, 42 (2005) (Benham, J., concurring) (noting that "the right to a jury drawn from a fair cross-section of the community" is ultimately a right that belongs to the community and not just the individual).

Here, SCAD has not demonstrated (or even asserted) any justification for such an extremely narrow pool, rather than one that included, for example, all arbitrators with a labor and employment expertise, or even arbitrators who were former *state* court judges— either of which would have included a more diverse group of potential arbitrators. Instead, by drafting this provision to ensure that no Black

arbitrator—nor one from any protected category of race, ethnicity, or gender will hear the claim—SCAD has further tipped the scales in its own favor to create rules "so one-sided that their only possible purpose is to undermine the neutrality of the proceeding." *Hooters of Am.*, 173 F.3d 933 at 938.

### D.    The ADRPA and APM are Procedurally Unconscionable.

The ADRPA and APM are procedurally unconscionable because they contain indefinite and non-mutual terms.  The court below erred by finding otherwise.

### 1. Indefiniteness

Mr. Payne argued below that there are multiple terms in the ADRPA and APM that are indefinite, contradictory, and therefore unconscionable. However, rather than finding the ADRPA to be unenforceable, the lower court erroneously interprets this vague, confusing, contradictory, and convoluted language in favor of SCAD.

Under Georgia law, a contract is procedurally unconscionable and therefore unenforceable "if its terms are incomplete, vague, indefinite, or uncertain . . .. The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the

parties agreed upon." *Matthews v. Ultimate Sports Bar, LLC*, No. 1:13-CV-2353-TWT, 2016 WL 4035655, at *2 (N.D. Ga. July 28, 2016) (quoting *Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (2009) and *Aukerman v. Witmer*, 256 Ga. App. 211, 214 (2002)). The ADRPA and APM, particularly when read together, are indefinite because they have contradictory, confusing, and unintelligible terms.

**The Version of the ADRPA that was "In Effect."** The 2015 version of the ADRPA, which the district court found governs this dispute, provides that "SCAD retains the right to modify or terminate this ADRPA and the [APM] on thirty days' written notice. The policy, if any, in effect at the time a request for mediation and/or arbitration is initiated, will govern the process by which the Dispute is resolved." (ADRPA/APM Chart, ¶9). This provision is ambiguous because it fails to identify with precision which policy will govern a given dispute.

The lower court's cure for this ambiguity is effectively to insert "…as to Plaintiff" following "in effect…". However, this insertion materially and unnecessarily changes the ADRPA, which, in a more natural reading, ties the version "in effect" not to the date of the dispute, but rather to the time a party demands arbitration. Moreover,

this insertion materially prejudices Mr. Payne because it excuses a fatal procedural flaw on Defendant's part: not providing Mr. Payne with 30 days' notice of a unilateral amendment.

When SCAD unilaterally modified the ADRPA in 2019 without providing 30 days' notice to Mr. Payne or, presumably, to other former employees whose grievances would then be governed by the modified version, SCAD showed the former purported arbitration agreement to be illusory. *See Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *cf. Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1376-77 (11th Cir. 2005) (arbitration agreement was not illusory because the employer was required to provide notice before modifying arbitration agreement).

However, even if the "in effect" language, and consequently Defendant's implementation of the 2019 version of the ADRPA without notice, is not illusory, the ambiguity shows the provision at the very least is indefinite, as "it is [not] expressed in language sufficiently plain and explicit to convey what the parties agreed upon." *Matthews*, 2016

55

WL 4035655, at *2.

**Selection of the Arbitrator**. The ADRPA provides that the arbitrator the parties select "must be a retired federal judge unless a retired federal judge is not available to hear the dispute in a timely manner." (ADRPA/APM Chart, ¶ 4). However, the APM requires that the parties submit a list of four proposed arbitrators "with a minimum of five (5) years of previous experience or background in the subject matter of the arbitration. In addition, the parties agree the proposed *mediators* shall include as many retired federal judges as possible who are available to hear the dispute in a timely manner." (*Id.* (emphasis added)).  When read together, these provisions of the ADRPA and APM contradict each other: The ADRPA requires a retired federal judge unless one is not available; the APM allows the parties to agree on any arbitrator with five years' experience but requires a mediator to be a retired federal judge with subject-matter expertise.

The district court concludes that "the fact that the Arbitration Procedures mention 'proposed *mediators*' is not enough to eviscerate the parties' intent.  It is obvious that term is referring to the selection of the arbitrator."   However, throughout the ADRPA, mediation and

56

arbitration are treated differently. *See, e.g.,* ADRPA/APM Chart §§ 3 & 4. The parties and the Court are bound by the actual language of the ADRPA and APM. *See Morgan,* 142 S.Ct. at 1713; *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1311 (N.D. Ga. 2012). When read together, the provisions of the ADRPA and APM contradict each other: the ADRPA requires a retired federal judge unless one is not available; the APM requires a *mediator* to be a retired federal judge with subject-matter expertise. Therefore, the court below erred when it sought to reconcile these contradictory terms.

**Use of an Arbitration Form**. The APM requires that a party seeking arbitration submit a "Request for Arbitration" form. [Doc. 35-1, p. 9]. In contrast, the ADRPA requires instead "a written request to the vice president for human resources. This request should provide a brief statement of the dispute and the underlying facts." [Doc. 20-1, p. 73]. The district court interprets these conflicting terms as "both requir[ing] the party seeking to resolve a dispute to initiate the process by submitting a form" to Human Resources. R&R at 44. However, the APM requires a specific form; the ADRPA does not. R&R therefore errs in

stating otherwise. This conflict between the ADRPA and the APM cannot be reconciled.

## 2. Non-Mutual Terms

The ADRPA and APM have a number of non-mutual provisions that make them procedurally unconscionable. The court below misapplied the law with respect to mutuality and incorrectly found certain provisions of the ADRPA did not lack mutuality.

The R&R correctly indicates that SCAD, but not the employee, can bypass at least the internal-review and mediation pre-arbitration stages. The R&R also appears not to dispute—as is obvious—that this provision is non-mutual. R&R at 61.

However, the R&R errs in finding that SCAD cannot also bypass the ADRPA provision that each party has 30 days to notify the other if it is not satisfied with the outcome of SCAD's internal review or mediation. *Id.* The sentence that immediately follows the 30 days' notice requirement provides that "SCAD may elect to bypass one or more steps prior to arbitration for Disputes with the employee." ADRPA/APM Chart ¶ 6. The 30-day notification requirement is a step prior to arbitration. *Id.* As such, particularly in light of the placement of

the provision immediately following the 30-day notification requirement, SCAD may unilaterally bypass it. Therefore, this provision also lacks mutuality.

The R&R relies on *Caley*, 428 F.3d 1359, to recommend that the lack of mutuality in the ADRPA is immaterial to its unconscionability analysis and is distinguishable from the mutuality analysis Plaintiff has made. Critically, however, and as the R&R notes, *Caley* concludes that Georgia law does not require mutuality of *remedy*. R&R at 60. However, mutuality of *remedy* and mutuality of *obligation* are different. In *Caley*, the Eleventh Circuit's mutuality analysis extends only to the plaintiff's position that "some claims, many of which would typically be brought by an employee, are subject to arbitration and others, many of which would be brought by Gulfstream, are not." *Id*. at 1378. This may be contrasted with mutuality of obligation, the lack of which would make a Georgia contract illusory and unconscionable. *See*, *e.g.*, *Neibert v. Computer Scis. Corp.*, No. 1:12-CV-02277-SCJ, 2014 WL 11462721, at *7 (N.D. Ga. Feb. 4, 2014), *aff'd*, 621 F. App'x 585 (11th Cir. 2015) ("'words of promise [which] by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course

of conduct in other respects he may pursue, do not constitute a promise.'") (quoting *Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc.*, 215 Ga. App. 194, 198, 450 S.E.2d 427, 431 (1994)).

The lack of mutuality in the ADRPA's pre-arbitration process—SCAD's ability to bypass it all—renders performance of those aspects of the contract optional for Defendant. As such, they impose non-mutual obligations and therefore are unconscionable.

## II.    The Court Should Decline to Enforce the Agreement, Rather Than Severing Unconscionable Terms.

Under Georgia law, a court has multiple options when confronted with an unconscionable agreement: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made" the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Ga. Code Ann. § 11-2-302. As stated in the "Purposes" addendum to § 11–2–302, the Georgia General Assembly expressed its intentions as follows: "Under this section, the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single

60

clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results." Ga. Code Ann. § 11-2-302.

Courts have foreclosed severance if the unconscionable provisions comprise essential aspects of the agreement as a whole, or if they demonstrate a systematic effort to create a one-sided, employer-friendly forum." *Cannon*, 2012 WL 1004914, at *8 (citing *Nino*, 609 F.3d at 206–207 (citing Restatement (Second) of Contracts § 184)) (finding that the agreement should not be given effect because the "Court cannot limit the unconscionable effect of these terms without rewriting the agreement with respect to its essential aspects" where court found unconscionable the provisions governing the selection of arbitrator and the rules governing the scheduling and conduct of arbitration). Courts in this Circuit have refused to sever, relying on Georgia law, where "[t]he Court cannot fix these aspects of the agreement 'without rewriting the agreement with respect to its essential aspects, which, under O.C.G.A. § 11-2-302, this Court would be disinclined to do.'" *Matthews*, 2016 WL 4035655, at *3 (citing *Cannon*). *Cf. Perez v. Globe*

61

*Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1287 (11th Cir. 2001) (citations omitted), *subsequently vacated on procedural grounds*, 294 F.3d 1275 (11th Cir. 2002) (severing an invalid provision from an arbitration clause "would reward" the drafter of the provision and "fail to deter similar conduct by others," which could ultimately "deter an unknowledgeable [party] from initiating arbitration" and also "add an expensive procedural step" of seeking severance in court before moving to arbitration).[13]

The "essential terms" which these courts found unconscionable and impossible to sever included the arbitrator selection clause (*Cannon, Matthews*) and the rules and procedures governing arbitration (*Cannon*, *Matthews*). Other appellate courts have found severance inappropriate where "the unconscionable arbitration provisions 'are so one-sided that their only possible purpose is to undermine the neutrality of the proceeding.'" *Nino*, 609 F.3d at 207 (quoting *Hooters of Am.*, 173 F.3d at 941 ("To uphold the promulgation of this aberrational

---

[13] Though *Perez* is not binding because it was later vacated on procedural grounds, this Court's reasoning in *Perez* is nevertheless persuasive. SCAD's ADRPA and APM are clear illustrations of why a "see what sticks" approach to arbitration agreements cannot be allowed.

scheme under the heading of arbitration would undermine, not advance, the federal policy favoring alternative dispute resolution.")).

Here, the district court has already severed SCAD's unilateral control over the arbitration venue. R&R at 42-43. Because, as set forth above, there are multiple additional unconscionable terms in the ADRPA and APM, the Court should determine the entire purported agreement to arbitrate is not enforceable.

## III. The District Court Erred in Not Concluding That SCAD Waived Its Right to Arbitrate.

Although SCAD now seeks to enforce the ADRPA, it has waived any arguable entitlement to arbitration by pursuing confidentiality agreements with a key witness to Mr. Payne's case,[14] and presumably others, with the effect of curtailing the evidence Mr. Payne can present. The district court erred when it found that "Plaintiff was not prejudiced by that conduct, and Plaintiff has not convinced the Court that Defendant intended to limit his ability to access witnesses during

---

[14] As of the date of Mr. Payne's declaration submitting the SCAD's proposed confidentiality agreement with the witness, he had declined to sign it, thus foregoing his athletic scholarship. Payne Decl. at ¶ 38. The witness may have since entered into a separate settlement with SCAD. Whether the matter was resolved is a question only SCAD can answer, assuming a potential settlement would required confidentiality.

arbitration." R&R at 67. Further, even if Mr. Payne cannot currently prove waiver, he has shown a genuine factual dispute exists on the question, warranting early limited discovery.

As a threshold matter, the R&R bases its holding in large part on its conclusion that SCAD's alleged misconduct did not prejudice Mr. Payne. *Id.* at 67. The R&R notes that "the Court must consider whether the offending party's conduct 'has in some way prejudiced the other party.'" *Id.* (quoting *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018)). However, the Supreme Court dispensed with the prejudice element of the waiver doctrine in *Morgan*, 142 S.Ct. at 1712-13. Therefore, to the extent the R&R determines SCAD did not waive its enforcement of the ADPRA because Mr. Payne did not show prejudice, this has been abrogated by *Morgan*.

More broadly, "it is well established that a party may waive its right to compel arbitration by acting in a manner which is inconsistent with the right of arbitration," *Epps v. Rockmo Entm't, LLC*, 849 S.E.2d 510, 514 (Ga. Ct. App. 2020), and "in so acting, has in some way prejudiced the other party," *Langfitt v. Jackson*, 284 Ga. App. 628, 633, 644 S.E.2d 460, 464 (2007). "There is no set rule . . . as to what

64

constitutes a waiver . . . of the arbitration agreement." *Burton-Dixie Corp. v. Timothy McCarthy Constr. Co.*, 436 F.2d 405, 408 (5th Cir. 1971).

The question of whether SCAD entered into confidential settlement agreements with other former Fishing Team members, which could only be answered through discovery, *Reed v. Eastside Med. Ctr.*, LLC, No. 1:19-CV-03967-SDG, 2020 WL 5659436, at *7 (N.D. Ga. Sept. 23, 2020), impacts the arbitrability issue before this Court. The agreements effectively would preclude any student who signed the agreement from voluntarily participating or providing information related to Mr. Payne's claims. While Mr. Payne could compel, via subpoenas, the students to produce documents and attend depositions in the discovery process of federal litigation, no such right exists in arbitration. *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1160 (11th Cir. 2019) (the FAA "does not permit pre-hearing depositions and discovery from non-parties").

Thus, because Mr. Payne cannot compel pre-hearing discovery from third parties in arbitration, he will be unable to obtain information in the arbitral forum from any student who is prohibited by a

confidentiality agreement from voluntarily speaking with him. Rather, Mr. Payne would confront the student for the first time at the hearing with no prior knowledge of their position or prospective testimony.

Though the question of whether encouraging or having prospective witnesses sign confidentiality agreements to prevent cooperation with fact finding in an arbitration appears to be an issue of first impression in this Court, it is analogous to the interference with third-party discovery in litigation. Courts routinely prohibit such interference and sanction parties for engaging in this behavior. *See*, *e.g.*, *WellStar Health Sys., Inc. v. Kemp*, 324 Ga. App. 629, 635, 751 S.E.2d 445, 451 (2013) (trial court did not abuse discretion by disqualifying attorneys who pressured non-party expert witness not to cooperate (but finding entering default on behalf of aggrieved party was too severe a sanction)); *Residential Constructors, LLC v. ACE Prop. & Cas. Ins. Co.*, No. 2:05-CV-01318-BESGWF, 2006 WL 1582122, at *3 (D. Nev. June 5, 2006) (ordering plaintiff not to advise non-party witnesses against speaking with defendant's counsel).

For these reasons, SCAD, by its conduct, has waived any right to arbitration.[15]  Alternatively, Mr. Payne should be entitled to discovery on SCAD's communications with other former Fishing Team members.

## IV.    The District Court Erred in Not Permitting Mr. Payne To Take Discovery on Issues of Arbitrability.

The District Court erred in not permitting Mr. Payne to take limited early discovery on issues of arbitrability. [Doc. 40]. Early discovery is necessary on two issues, to the extent they are material to the arbitrability dispute. *See Bazemore*, 827 F.3d at 1333; *Reed,* 2020 WL 5659436, at *7. The subjects of limited early discovery would be:

- Based on the declaration and deposition testimony of Darnell Holcomb, whether SCAD engaged in a pattern of weaponizing the cost-shifting provision in the ADRPA in other arbitrations. Thus, Mr. Payne seeks discovery

---

[15] Defendant's effort to buy the silence of the prospective witness also highlights another bizarre provision of its APM. According to the APM, "if a party takes any action to discourage a witness from cooperating with discovery demands, the Arbitrator shall preclude the party from calling this witness at the arbitration hearing…." [Doc. 35-1, p. 12]. This, of course, does not address a situation where a party interferes with an adverse witness.

regarding SCAD's past arbitrations with employees and former employees.[16]

- Whether SCAD offered financial incentives to prospective witnesses to prevent them from voluntarily cooperating with Mr. Payne in the arbitration, Thus, Mr. Payne seeks discovery into SCAD's communications with these potential witnesses.

## CONCLUSION

For the foregoing reasons, Mr. Payne respectfully requests that this Court **REVERSE** the district court's order granting Defendant/Appellee's motion to compel arbitration and denying Plaintiff/Appellant's motion for limited early discovery, and **REMAND** the case to the district court for further proceedings consistent with this Court's decision.

//

//

//

//

//

---

[16] Mr. Payne would agree to a reasonable protective order limiting public disclosure of information related to the other arbitrations.

68

Respectfully submitted on August 5, 2022.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
Counsel for Plaintiff-Appellant

Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300 Telephone
(678) 271-0312 Facsimile

69

*Isaac Payne v. The Savannah College of Art and Design, Inc.,
Appeal No. 22-11556*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this pleading is prepared in 14-point Century Schoolbook font and complies with this Court's 13,000 word-count limitation, having 12,641 words.

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that the foregoing Brief of Appellant was filed through the Court's electronic filing system on August 5, 2022.

The undersigned counsel further certifies that on August 5, 2022, four (4) paper copies of the foregoing Brief of Appellant were mailed to the Clerk of Court by U.S. Priority Mail, postage prepaid.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070